UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

IRA W. BELSER,                    :        Case No. 1:14-cv-550
                                 :
        Plaintiff,               :        Judge Timothy S. Black
                                 :
vs.                              :
                                 :
COMMISSIONER OF                  :
SOCIAL SECURITY,                 :
                                 :
        Defendant.               :

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IS AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to supplemental security income ("SSI") and disability insurance

benefits ("DIB").  (*See* Administrative Transcript at Doc. 6-2 ("Tr") (Tr. 13-29)

(ALJ's decision)).

**I.**

Plaintiff applied for DIB and SSI on October 28, 2010, alleging disability

beginning on January 10, 2003, due to schizoaffective disorder, bipolar disorder,

depression, memory loss, carpal tunnel syndrome, back and hip pain, high blood

pressure, and polysubstance dependence.  (Tr. 13, 244-250, 251-256).[1]  The state agency denied Plaintiff's applications initially and upon reconsideration, and Plaintiff timely requested a hearing.  (Tr. 13, 151-153, 154-156, 162-164, 166-168, 170-171).  In June 2012, the ALJ held a hearing at which Plaintiff, in the presence of counsel, and a vocational expert testified.  (Tr. 13, 53-72).  After the hearing, responses to medical interrogatories were proffered by Dr. James Brooks.  (Tr. 999-1003).  Thereafter, in February 2013, a supplemental hearing was held at counsel's request and Dr. Brooks testified.  (Tr. 13, 36-51).

On February 28, 2013, the ALJ found that Plaintiff was not entitled to DIB or SSI during the relevant time frame.  (Tr. 13-29).  In May 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-3), and this became the Commissioner's final and appealable decision.  *See* 20 C.F.R. §§ 404.955, 404.981, 416.1481.  Plaintiff filed a timely appeal with this Court.

At the time of the hearing, Plaintiff was 55 years old.  (Tr. 27)  Plaintiff completed the seventh grade in special education classes.  (*Id*.)  Plaintiff has past relevant work

---

[1]  Plaintiff filed one past concurrent claim for DIB and SSI.  (Tr. 13).  The prior application resulted in an unfavorable decision dated December 19, 2006.  (Tr. 13, 76-84).  The ALJ found no basis for reopening the prior decision.  (Tr. 13).  The ALJ found that there had been no new and material evidence submitted that warranted a departure from the previous ALJ's decision and therefore he adopted and incorporated in his decision the prior decision's findings for the period ending on December 19, 2006.  (Tr. 13).  Specifically, since the prior decision, the ALJ determined that alcohol and illicit drug abuse has become a material contributing factor.  (Tr. 14).  However, in the absence of alcohol and illicit drug abuse, the claimant has retained an RFC similar to the previous ALJ's findings, and therefore there has been no new and material evidence supporting the inclusion of exertional limitations, although the ALJ found that new and material evidence warranted the inclusion of several additional nonexertional limitations.  (*Id*.)

experience[2] as a truck driver for an excavating company, last working on January 1, 2003. (Tr. 57).[3]

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1.    As mentioned above, there has been no new and material evidence submitted that warrants a departure from the previous Administrative Law Judge's decision for the period adjudicated ending on December 19, 2006, the date of the last Administrative Law Judge's decision. Therefore, the undersigned adopts and incorporates herein the prior decision's findings for the period ending on December 19, 2006.

2.    The claimant met the insured status requirements of the Social Security Act through March 31, 2008, but not thereafter.

3.    The claimant has not engaged in substantial gainful activity since December 20, 2006, the start of the unadjudicated period at issue (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

4.    Since December 20, 2006, the claimant has the following severe impairments: asthma, hypertension, affective disorder, personality disorder, substance-induced schizoaffective disorder, and polysubstance dependence (20 CFR 404.1520(c) and 416.920(c)).

5.    Since December 20, 2006, the claimant's impairments, including the substance use disorders, meet sections 12.04 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

6.    If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

---

[2] Past relevant work experience is defined as work that the claimant has "done within the last 15 years, [that] lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 416.965(a).

[3] Plaintiff was laid off from his last job, which was unrelated to any physical or mental difficulties that he was having. (Tr. 57).

7.　　If the claimant stopped the substance use, the claimant could not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

8.　　Since December 20, 2006, if the claimant had stopped the substance use, the claimant would have had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He would have had to avoid concentrated exposure to extreme temperatures and pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. He would have been able to perform simple, routine tasks in a relatively static work environment. He would have required a low stress work environment without strict production quotas or high pace demands and where interaction with others would have been occasional and superficial. He would have also been able to respond to simple, infrequent changes in work setting.

9.　　If the claimant stopped the substance use, the claimant would be unable to perform past relevant work (20 CFR 404.1565 and 416.965).

10.　　The claimant was born on August 21, 1957 and was 29 years old, which is defined as a younger individual age 45-49, on December 20, 2006 (20 CFR 404.1563 and 416.963).

11.　　The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

12.　　Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

13.　　Since December 20, 2006, if the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

14.　　Since December 20, 2006, the substance use disorder is a contributing factor material to the determination of disability because the claimant

would not be disabled if he stopped the substance use (20 CFR 404.1520(g), 404.1535, 416.920(g), and 416.935).  Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Tr. 16-28).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was therefore not entitled to SSI or DIB.  (Tr. 29).

On appeal, Plaintiff alleges that the ALJ: (1) erred in determining that drugs and alcohol are material to his disability; (2) did not give proper weight to Dr. Jones' RFC opinion; and (3) erred in determining that he does not meet Listing 12.04A and B.  The Court will address each error in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:

### 1. *Medical Evidence*

Plaintiff has a long history of psychiatric inpatient stays. In May 2006, he was admitted to University Hospital Psychiatric Emergency Services after the police picked him up outside of the hospital. Plaintiff presented with both suicidal and homicidal ideation. (Tr. 359, 380, 429, 432). He admitted to feelings of depression and anhedonia,[4] suicidal ideation, decreased sleep and appetite, decreased energy, ruminating thoughts and paranoia, and some homicidal ideation with thoughts of hurting people. (Tr. 364).

---

[4] Anhedonia is the inability to experience pleasure from activities usually found enjoyable.

6

He was unable to contract for safety and reported a plan to put a bag over his head. (*Id*.) He reported being on Depakote and Zoloft in the past but discontinued both because they did not work. (*Id*.) While the ER doctor noted Plaintiff's current mood state was likely due to marijuana consumption, his primary diagnosis at discharge was schizoaffective disorder. (Tr. 435).[5] He was discharged on Lithium. (Tr. 436).

Plaintiff commenced treatment with Greater Cincinnati Behavioral Health ("GCBH") in January 2010 after presenting to Christ Hospital psychiatric ward for psychotic behavior. (Tr. 776-777). At his initial evaluation with Dr. Jones, he reported a recent history of hearing voices calling his name and getting messages through the television, which improved with his hospital stay and resumed medications. (Tr. 778). Dr. Jones' initial diagnoses included schizoaffective disorder, cannabis dependence, and cocaine abuse remission. (*Id*.) Dr. Jones started Plaintiff on 300 mg of Lithium Carbonate. (Tr. 779). GCBH notes evidence poor compliance with medications and missed appointments. In a termination summary dated July 19, 2010, Plaintiff's case manager noted "client is difficult to engage in treatment services and at risk for rapid decompensation-poor psychiatric appointment follow thru." (Tr. 792).[6]

Plaintiff was again admitted to the Christ Hospital psychiatric ward for a week in late June/early July of 2010 after presenting with suicidal ideation and psychosis. (Tr.

---

[5] Plaintiff admitted that he recently relapsed on drinking alcohol and smoking marijuana. (Tr. 17). He also reported that he stopped taking his prescribed psychotropic medication in April 2009. (*Id*.)

[6] In July 2010, Plaintiff claimed no alcohol for the past month, but said that he had been drinking 3-4 shots of gin a day for the entire year prior. (Tr. 18). He also reported some crack-cocaine use and was smoking at least two joints a day. (*Id*.)

587).[7]  He reported having difficulty with his thoughts, being extremely angry, feeling suicidal and stated he would overdose on his pills.  He related that he had not taken medications for quite some time because they were making him very drowsy and sleepy. (Tr. 594).  He was diagnosed with schizoaffective disorder, depression-type, polysubstance abuse, and personality disorder.  (*Id*.)  With proper treatment, medication, and sobriety, Plaintiff's mental condition improved and he was discharged within a week. (Tr. 17).  The discharging psychiatrist referred to a Global Assessment of Functioning score of 55.[8]  (*Id*.)

Plaintiff was reconnected with GCBH after his June/July hospital stay at Christ Hospital.  (Tr. 789).  His case manager noted in October 2010, that Plaintiff sometimes "needs strong prompting from counselor to determine specific areas he wants to improve in his life," and presents "with strong feelings of anger and at times expresses that he thinks about hurting people, but that he does not plan to do this and will walk away and isolate himself if this thought occurs."  (Tr. 784).  Plaintiff continued to present to his appointments "in an anxious manner" and "so overwhelmed with situations in his life and

---

[7]  When he presented to the hospital in June, Plaintiff reported that he was still smoking up to 3 grams of marijuana a day and had stopped taking prescribed psychotropic medication in February.  (Tr. 18).  The admitting psychiatrist referred to significant depression and decompensation due to noncompliance and using street drugs.  (*Id*.)

[8]  The Global Assessment of Functioning ("GAF") is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults.  A score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

the emotions that these situations bring out." (Tr. 786, 788).  Notes also indicate

problems maintaining relationships with family members.  (Tr. 782).

Throughout 2010 and 2011, Plaintiff continued to complain of depression, and

intermittent auditory hallucinations and paranoia, especially in public settings.  (Tr. 809,

818, 820, 877).  He reported some decrease in depression with treatment, but Dr. Jones'

treatment notes also evidence difficulty working with his therapist as they talked about

his past abuse.  (Tr. 878, 884, 887).  Case manager notes evidence that Plaintiff also

presented as "very flat" and "lacks the ability to communicate effectively if he isn't

comfortable in that environment," he often presents with blunted affect and does not

follow through with treatment and medications.  (Tr. 926, 982, 993).

In April 2011, Plaintiff acknowledged increased difficulty attending sessions,

stating "I know something's going to go wrong- I'm going to be depressed and not get

out of bed, or I'm going to be anxious and my stomach will be upset."  (Tr. 940).

Case manager notes from 2012 evidence conflicting reports of improvement with

medication versus continued depression with adverse side effects from medication.  (Tr.

1055-1057, 1063, 1065).

In between his July 2012 and February 2013 hearings, Plaintiff was again

psychiatrically hospitalized from August 27, 2012 to September 5, 2012 for suicidal

ideation and depression at the advice of Dr. Jones, after presenting to his scheduled

appointment.  (Tr. 1008, 1049).[9]  Similar to prior hospitalizations, he described a plan to
overdose or asphyxiate himself.  (*Id*.)  On exam, he exhibited thought blocking, positive
paranoia, and positive auditory and visual hallucinations.  (Tr. 1012).  In communication
with the hospital, Dr. Jones reported that Plaintiff had not been seen by their agency for
several months and was inconsistent with appointments and medication.  (Tr. 1017).  He
was discharged with a diagnosis of schizoaffective disorder and started on Celexa,
Wellbutrin, and Seroquel.  (Tr. 1012).

Dr. Jones completed a mental RFC questionnaire dated February 7, 2012, in which
he listed diagnoses including schizoaffective disorder, cannabis dependence, and alcohol
dependence-episodic.  (Tr. 895).  He noted partial response to treatment including
medication, case management, and counseling.  (*Id*.)  Dr. Jones described clinical
findings including depression with limited affect, intermittent auditory hallucinations,
and delusional thinking and paranoia.  (*Id*.)  These findings are supported by Dr. Jones'
treatment notes.  (Tr. 809, 818, 820, 877, 972, 1017).  Case manager notes evidence the
same.  (Tr. 926, 982, 993).

Dr. Jones indicated several significant limitations in Plaintiff's ability to perform
even unskilled work, including maintaining regular attendance, sustaining an ordinary
work routine, working with others in close proximity, completing a normal
workday/week, performing at a consistent pace without unscheduled breaks, accepting

---

[9]  At this time, Plaintiff reported that he was smoking marijuana on a daily basis and had not taken any
prescribed psychotropic medication in over four months.  (Tr. 18).  During his admission, Plaintiff was
advised of the effects that drugs and alcohol had on his mood and encouraged to maintain a clean and
sober lifestyle.  (Tr. 19).

instructions and responding appropriately to criticism, getting along with coworkers or peers, and dealing with normal work stress (Tr. 896), noting Plaintiff's problems with paranoia and delusional thinking (*Id.*)  Dr. Jones also indicated marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and three episodes of decompensation within a 12 month period, each of at least two weeks' duration.  (Tr. 898).

Dr. Jones opined that Plaintiff would miss more than four days of work per month (Tr. 899).  He concluded that Plaintiff's "cannabis use is a contributing factor, but even if he did not use it, his limitations from his mental illness would still be substantial and prevent him from working."  (Tr. 900).  He further concluded, "I do not think there would be a significant change" if Plaintiff were totally abstinent from alcohol or substance abuse.  (*Id.*)

Plaintiff attempted vocational rehabilitation in 2010.  (Tr. 1039).  During his initial interview, Plaintiff admitted that he remains very isolated and becomes easily irritated when around people.  (*Id.*)  He reported that he had been fired from jobs in the past due to confrontation with clients and bosses.  (*Id.*)  Interviewer Veronica Britsch noted that, throughout his interview, Plaintiff never made eye contact; he was guarded and hypervigilant; his affect was flat and speech was monotone; he rarely blinked and his sight was fixed on the wall; he was sweating profusely; he appeared to be mentally unstable and was unable to hold a conversation; his demeanor was rigid and his thought process was distorted.  (Tr. 1040).  She concluded that Plaintiff is significantly affected in

11

areas of self-care, self-direction, interpersonal skills, and work skills.  (*Id.*)  Despite these findings, Plaintiff was given a position in the kitchen at GCBH under the supervision of a job coach. (Tr. 1043).  On Day 1, he forgot to come to work.  (*Id.*)  While it was noted that Plaintiff showed he is ready to work, he missed 2 out of 10 days and did not appropriately notify work staff that he would be missing work.  (Tr. 1045).  When questioned about this work attempt at the hearing, Plaintiff testified that he was not aware that he had to return to the job.  (Tr. 51). The ALJ asked him about his thoughts on the interviewer commenting that he would be a good worker, and Plaintiff replied that would sometimes be true, but his mood swings would interfere, and he would not be capable of maintaining the job.  (Tr. 46).[10]

### 2.      *Plaintiff's Testimony from July 16, 2012 Hearing Testimony*

At the first hearing, Plaintiff testified that he last worked in 2003 for an excavating company.  (Tr. 57).  He reported that he was currently unable to work due to his mood swings and depression.  (Tr. 58).  He described problems getting out of bed, forgetfulness, and fatigue.  (*Id.*)  He further testified that if he was given his old job, he would not be able to perform it "emotionally," noting that he would forget where his job sites were, he would have problems with anger, and he would forget things.  (*Id.*)

---

[10]   At the hearing, the ALJ also referenced work that Plaintiff did at an animal shelter for the Ohio Rehabilitation Services Commission.  The ALJ noted that ORSC found that "Ira is very hard working, seems to be dedicated and is goal driven and oriented, is pleasant to talk to once he opens up.  All in all, Ira worked very efficiently in a timely manner.  He showed that he's definitely able and ready to work in the community and that he would be successful.  He was always punctual and had his own source of transportation.  He could also be successful without a job coach as he's very self-sufficient and independent."  (Tr. 45-46).

He reported that he was not currently being treated for substance abuse, and he was still using marijuana and alcohol on a daily basis. (Tr. 60). He reported the longest time period he has gone without using any drugs or drinking was about a year in 2005, when he was arrested for felony fleeing and put into rehab. (Tr. 61). The ALJ asked him if he felt better during this period, and Plaintiff reported that he "felt the same, basically." (*Id*.) He further reported that he did not feel he would have been able to perform his old job again, because of his mood swings. (*Id*.) He also reported that his medication takes the "edge off," but he still has "the same effects," leading him to smoke more marijuana and drink in an attempt to control his symptoms. (*Id*.) He testified that he usually does not drink much, but when he is feeling really depressed and hurting, he will start drinking more. (Tr. 61-62). When questioned by the ALJ, Plaintiff admitted that marijuana helps him feel better, that it takes away some of the anxiety or sorrow he is feeling and tones down some of the anger. (Tr. 62).

Plaintiff reported that if he were offered a job where he did not have much interaction with people, he would try to go to work every day, but he would have problems getting out of bed in the mornings. (Tr. 62). As Plaintiff was crying at this point in the hearing, the ALJ asked him if he has crying spells, to which he replied that he does pretty much every day if he is in an uncomfortable situation. (Tr. 63). Plaintiff reported that he had been to a hearing before and did not feel like he was going to get the

help that he needed.  (*Id*.)[11]

Plaintiff testified that he has been seeing Dr. Jones since 2005.  (Tr. 63).  He reported that he was seeing a therapist, but it was not helping because he has problems talking about things that are painful from his past.  (Tr. 63-64).  He reported that he was not currently taking medications because he was having negative side effects.  (Tr. 64).  He reported that he has been taking Seroquel, Wellbutrin, and Celexa for over a year.  (*Id*.)  He further reported that the medications "would take the edge off," but he continued to have the same symptoms of feeling angry, afraid, and depressed.  (Tr. 65).  He admitted that marijuana allows him to "feel somewhat normal" and that he does not seem to be as out of control with his emotions.  (*Id*.)  He also admitted to missing a lot of appointments with Dr. Jones because he would not remember them.  (*Id*.)  While he lives mostly with his brother, he reported that his brother does not help him with remembering his appointments and taking his medications.  (Tr. 66).  He reported increased alcohol intake when he is not on his medications.  (*Id*.)  He also reported feeling paranoid in public.  (Tr. 67).  He further reported that he often hears voices.  (*Id*.)

From a physical standpoint, Plaintiff reported that he experiences migraines once a week and has some symptoms of carpal tunnel in both hands.  (Tr. 67-68).  He further reported that his asthma is well-controlled with an inhaler.  (Tr. 69).

---

[11]  Plaintiff references a "rape [he] experienced" in his hearing testimony.  (Tr. 42).  However, the Plaintiff does not reference this experience or expand upon it in the pleadings.

### 3.     *Expert Testimony*

Given a hypothetical that mirrored the ALJ's RFC, the VE testified that Plaintiff would not be able to perform any past work, but there would be other jobs at the light, unskilled level that Plaintiff could perform, including merchandise marker, and at the medium, unskilled level, including auto detailer and hand packager.  (Tr. 70).

The VE explained that an individual would only be allowed to miss one day a month and still maintain employment.  (*Id*.)  If a person is going to be "getting emotional" at work whether it be crying or anger, on a regular basis (a couple times a week), he would not be employable.  (Tr. 71).

### 4.     *Plaintiff's Testimony from February 2013 Hearing*

Plaintiff testified that he had another psychiatric hospitalization between the first and second hearings, after presenting to Dr. Jones with suicidal ideation and increased depression.  (Tr. 41).  He reported that he was hospitalized for 10-days, and they released him once he started responding to the medications.  (Tr. 42).  He reported that, since his release, he had been taking Seroquel, Wellbutrin, and Viibryd.  (*Id*.)  He testified that the medications make him tired and sleepy.  (*Id*.)  When asked about his depression, he reported that he has some good weeks and bad weeks, describing a bad week as feeling tired, "heavy," and feeling a lot of anxiety and anger.  (*Id*.)  He reported continued

marijuana use, daily when he can afford it. (Tr. 43).[12] He reported that he still hears voices from time to time, even with medication. (*Id*.)

When questioned by the ALJ about his marijuana use, Plaintiff admitted that it makes him feel better, that it changes his way of thinking. (Tr. 44). He reported most of the time, he stays "shut off" to himself because he does not want everyone to "get the butt of" his attitude when he feels angry. (*Id*.)

### 5.   *Expert Testimony*

When asked whether Plaintiff's diagnosis of schizoaffective disorder was strictly from his marijuana use, Dr. Brooks answered "well, I can't say that absolutely." (Tr. 49). He recognized Dr. Jones' opinion that Plaintiff would still have problems without use of substances and indicated that he was basing his testimony mainly on the fact that after hospitalization, it appears that Plaintiff quickly improves when he is not on substances and taking medication. (*Id.*) When asked whether medication non-compliance is common in people suffering from schizoaffective disorder, Dr. Brooks testified "well, certainly." (*Id.*) He also testified that it is common for people with schizoaffective disorder to self-medicate with drugs and/or alcohol. (*Id.*) However, he testified that he did not find Plaintiff's statements -- that medications do not control his symptoms – to be valid. (Tr. 50). He further testified that Plaintiff may have a "substantial mental illness that's independent of his substance abuse," but he is not able to say that based on his records. (*Id.*)

---

[12]  Plaintiff reported that he gets marijuana from a family member. (Tr. 60). In order to pay for the marijuana, he gets help from his girlfriend and also donates plasma. (Tr. 60-61).

### 6. *ALJ Decision*

In his decision, the ALJ found that since the prior decision (in December 2006), alcohol and illicit drug abuse has become a contributing factor. Without alcohol and drugs, the ALJ found that Plaintiff retains an RFC similar to the previous ALJ's findings with no new and material evidence supporting the inclusion of exertional limitations, but with new and material evidence warranting the inclusion of several additional nonexertional limitations. (Tr. 13-14). Specifically, since December 20, 2006, Plaintiff has the following severe impairments: asthma, hypertension, affective disorder, personality disorder, substance-induced schizoaffective disorder, and polysubstance dependence. (Tr. 17).

Since December 20, 2006, if drugs and alcohol were not involved, the ALJ gave Plaintiff an RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations: he would have to avoid concentrated exposure to extreme temperatures and pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation; he would be able to perform simple, routine tasks in a relatively static work environment; he would require a low stress work environment without strict production quotas or high pace demands and where interaction with others would be occasional and superficial; and he would be able to respond to simple, infrequent changes in the work setting. (Tr. 22).

Accordingly, the ALJ found that there were a significant number of jobs in the economy that Plaintiff could perform, and, thus, denied the claim. (Tr. 27-28).

**B.**

First, Plaintiff alleges that the ALJ erred in determining that drugs and alcohol are material to his disability.  Next, Plaintiff alleges that the ALJ improperly weighed the medical source opinion of treating physician, Dr. Jones.  These issues are inextricably intertwined, so the Court will consider them together.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

> One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

(*Id*.)  "The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Id.*  "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Id.*

18

The Commissioner's regulations establish a hierarchy of acceptable medical source opinions. The hierarchy begins at the top with treating physicians or psychologists. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Next in the hierarchy are examining physicians and psychologists, who often see and examine claimants only once. *See* 20 C.F.R. §§ 404.1527(d) and 416.927(d). In general, more weight is given to examining medical source opinions than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §§ 404.1527(d)(1) and 416.927(d)(1). Still, non-examining physicians' opinions are on the lowest rung of the hierarchy of medical source opinions.

"The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of the physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations of the opinions, than are required to treating sources. SSR 96-6p. "The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician." *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

Plaintiff contends that the ALJ erred in adopting the opinion of the medical expert, licensed psychologist Dr. Brooks, instead of the treating physician, Dr. Jones. The medical expert documented that Plaintiff had no more than mild impairments in functional areas when considered without substance abuse. (Tr. 1000). He further

opined that polysubstance dependency was Plaintiff's "primary problem" and that many of his symptoms were the result of substance abuse. (Tr. 21, 1002).

To the extent that medical opinions conflict, the ALJ must weigh the opinions and resolve any conflict between them. SSR 96-2p. The record illustrates that Plaintiff used alcohol and marijuana on a regular basis. (Tr. 18). When Plaintiff had extended periods of sobriety, the severity of his reported symptoms decreased. (*Id*.) For example, the ALJ cited to January 2011 treatment notes indicating that Plaintiff reported improved mood without hallucinations and only vague paranoid. (*Id*.) At the time, Plaintiff reported that he drank only an occasional glass of wine and had not used marijuana in 15 days. (*Id*.) Plaintiff's therapist noted improved mood with decreased paranoia and decreased delusional thinking. (*Id*.) The ALJ pointed out the "stark contrast" to an earlier visit one month prior in December 2010, when Plaintiff said he was using marijuana twice per day and he complained of increased depression, hearing voices, and other psychotic symptoms. (*Id*.) In April 2011, while he was smoking at least three joints a day and drinking wine on a nearly daily basis, Plaintiff reported increased stress, depression, and paranoia. (*Id.*) However, in March 2012, when Plaintiff stated that he was not using any substances, he denied having psychotic symptoms. (*Id*.) A few months later, while Plaintiff reportedly was smoking marijuana once again on a daily basis, he presented to the emergency department with complaints of worsening depression and thoughts of self-harm. (*Id.*) Plaintiff was psychiatrically admitted at that time and advised about the effects of substance use on his mood and was encouraged to maintain a clean and sober

lifestyle. (Tr. 19). Although Plaintiff required three psychiatric hospitalizations since December 2006, the events leading to the same were predicated by long-term non-compliance with medication and daily marijuana use. (Tr. 24). Based on these findings, and the record as a whole, the ALJ appropriately used his discretion and afforded the medical expert's findings significant weight.

The Social Security Act provides that an individual may not receive disability benefits if drug abuse is "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J). Where the ALJ finds that a claimant would not be disabled if the drug abuse stopped, the ALJ must find that it was a contributing factor material to the disability determination and should not award benefits. 20 C.F.R. § 404.1535(b)(2)(i), 416.935(b)(2)(i). *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (recognizing that "failure to seek medical care should not be a determinative factor in a credibility assessment where claimant is operating under a mental impairment" but indicating that other factors, including whether there was evidence to suggest that the claimant's medical condition hindered him from seeking treatment and whether the ALJ regarded a claimant's failure to seek medical treatment as a determinative factor were also relevant).

To determine if the claimant's drug or alcohol problem is a contributing material factor to his disability, "an ALJ may look at a claimant's periods of sobriety and compare those periods to times when the claimant was abusing substances." *Mulkey v. Comm'r of Soc. Sec.*, No. 1:10cv466, 2011 U.S. Dist. LEXIS 111386, at *1 (W.D. Mich. Sept. 29,

2011).  The claimant bears the ultimate burden of proving his substance abuse is not a contributing factor material to his disability.  *Underwood v. Comm'r of Soc. Sec.*, No. 4:08cv2540, 2010 U.S. Dist. LEXIS 5085, at *6 (N.D. Ohio Jan. 22, 2010).

The Social Security regulations also require a claimant to follow prescribed treatment if the treatment can restore the ability to work.  20 C.F.R. §§ 404.1530, 416.930.  If a claimant fails to follow prescribed treatment without good reason, he will not be found disabled.  SSR 82-59.  "An impairment that can be remedied by treatment cannot service as a basis for a finding of disability."  *Grocc v. Astrue*, No. 08-225, 2009 U.S. Dist. LEXIS 94714, at *4 (E.D. Ky. Oct. 9, 2009).

Therefore, based upon a review of the record, the ALJ's ruling is supported by substantial evidence.  The ALJ properly drew comparisons between Plaintiff's functionality during periods of sobriety and periods of substance abuse, and reasonably concluded that Plaintiff's substance abuse contributed materially to his disability.  Because the ALJ's decision is supported by the record, it is entitled to deference.  The Court is mindful that there is a "zone of choice" within which the ALJ can render a decision without disturbance by the Court.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

## C.

Finally, Plaintiff alleges that the ALJ erred in determining that he does not meet Listing 12.04A and B.  If a claimant meets or equals the requirements of a listed impairment, then the claimant is considered disabled.  20 C.F.R. § 404.1520(d).

Listing 12.04 describes affective disorders and provides in relevant part:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.  The required level of severity is met when the requirements in both A and B are satisfied.

    A.     Medically documented persistence, either continuous or intermittent, of one of the following:

    1.     Depressive syndrome characterized by at least four of the following:

          a.     Anhedonia or pervasive loss of interest in almost all activities; or
          b.     Appetite disturbance with change in weight; or
          c.     Sleep disturbance; or
          d.     Psychomotor agitation or retardation; or
          e.     Decreased energy; or
          f.     Feelings of guilt or worthlessness; or
          g.     Difficulty concentrating or thinking; or
          h.     Thoughts of suicide; or
          i.     Hallucinations, delusions, or paranoid thinking…

AND

    B.     Resulting in at least two of the following:

    1.     Marked restriction of activities of daily living; or
    2.     Marked difficulties in maintaining social functioning; or
    3.     Marked difficulties in maintaining concentration, persistence, or pace; or
    4.     Repeated episodes of decompensation, each of extended duration[.]

While the ALJ found that the claimant's mental impairments meet listings 12.04 and 12.09, the severity and frequency of Plaintiff's symptoms appear to be caused, in large part, to his continued substance abuse and poor compliance with medication. Plaintiff was unable to prove that his substance abuse was not a contributing factor

material to his disability.  *Underwood*, 2010 U.S. Dist. LEXIS 5085 at 6.  Accordingly, the ALJ properly found that Plaintiff was not entitled to disability benefits.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Ira Belser was not entitled to supplemental security income or disability insurance benefits, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED.** The Clerk shall enter judgment accordingly, whereupon case is **CLOSED** in this Court.

Date:  5/21/15                                    *s/ Timothy S. Black*
                                                 Timothy S. Black
                                                 United States District Judge